UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:23-cr-00123-JRS-MG |
| | ) | |
| THOMAS RAYFORD, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT THOMAS RAYFORD'S MOTION TO SUPPRESS EVIDENCE AND INCORPORATED MEMORANDUM OF LAW**

## I. INTRODUCTION

Defendant Thomas Rayford ("Defendant" or "Mr. Rayford"), by counsel, and pursuant to the Fourth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3)(C), respectfully moves this Court to suppress all evidence obtained directly or derivatively from the warrantless entry onto, and seizure at, 2030 Dewey Street, Anderson, Indiana, that occurred on October 31, 2023. Defendant further moves, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), for a hearing on the veracity of Detective Brian Gehrke's January 2, 2024 search warrant affidavits.

In brief, the pending charges against Mr. Rayford stem from an incident that occurred on October 31, 2023, when state actors entered the curtilage of 2030 Dewey Street in Anderson, Indiana and ordered the warrantless seizure of ten dogs from the property based on an uncorroborated, anonymous tip and on one agent's own undisclosed, unverified "prior intel." No warrant was sought or obtained, despite the Anderson Police Department's own documented,

longstanding awareness of this address. That single unlawful entry set in motion an unbroken chain of warrants and affidavits that, together, produced the evidence underlying the counts against Mr. Rayford now before this Court, including the firearms evidence supporting Count Nineteen.

As set forth below, the October 31 entry cannot be justified by any exception to the Fourth Amendment's warrant requirement. The Anderson Police Department's own admitted prior knowledge of complaints regarding this address defeats any "exigency" claim that officers lacked time to seek a warrant, and the anonymous tip that prompted the entry bears none of the corroboration required to justify governmental intrusion into constitutionally-protected curtilage. Every state and federal warrant that followed, including the social media warrants, the residence search warrant, and the drug warrant, is tainted fruit of that initial illegality under *Wong Sun v. United States*, 371 U.S. 471 (1963). In addition, the record independently supports a *Franks* hearing on Detective Gehrke's January 2024 affidavits, which omit material facts bearing directly on whether the October 31 entry had any lawful basis.

## II. STATEMENT OF FACTS

### A. The October 31, 2023 incident

On October 31, 2023, Kris Ockomon, identified in documents produced in discovery as the Senior Humane Officer for the Anderson Police Department ("APD"), received an anonymous tip phone call on his office phone. *Defendant's* Exhibit 1, *Ockomon Narr*. The caller was a woman who, in Officer Ockomon's own words, "wished to remain unknown," and the narrative does not reflect that she provided her name or any other identifying or contact information. *Id.* The caller reported that she had observed several dogs at 2030 Dewey Street that appeared emaciated and chained with "log chains," without food or water, at a property she stated was located across the street from a school. *Id.* She stated she was "concerned about the animals possibly getting loose

and harming a child." *Id.* The narrative does not reflect that the caller reported any dog currently loose, any ongoing attack, any injury to a person, or any other emergency in progress at the time of the call. *Id.* Officer Ockomon told the caller that there had been "several previous calls" at the address and that "action cards" had been left there, and stated he was separately aware of "previous intel information" connecting a "Thomas Rayford" to "previous involvement with dogfighting" at that address. *Id.* Officer Ockomon told the caller he would investigate personally. *Id.*

Officer Ockomon then drove to 2030 Dewey Street on his own initiative; nothing in his narrative describes him seeking a warrant, either before or at any point during his visit to the property. *Defendant's* Exhibit 1, *Ockomon Narr*. As he arrived, Mr. Rayford approached his vehicle and said, "Who the f*** are you?" Officer Ockomon identified himself by displaying his police radio and stating his name and role. Rayford responded, "Get the f*** off my property," and as he turned to walk back toward the residence, reached into his coat in a manner Officer Ockomon understood as an attempt to retrieve a firearm. Officer Ockomon retreated behind his vehicle and radioed for assistance. *Id.*

Uniformed APD officers Sergeant Frank Sigler and Officers M. Blackmond, J. Modglin, and Z. Taylor were dispatched to the address in response to that radio call, along with two additional animal control officers, all of whom arrived within minutes. *Defendant's* Exhibit 1, *Sigler Narr*.; *Defendant's* Exhibits 1 & 2, *Blackmond Narr*.; *Defendant's* Exhibit 1, *Modglin Narr*.; *Defendant's* Exhibit 1, *Taylor Narr*. None of the four uniformed officers describes entering the property itself; each states he remained at the property's edge or a designated perimeter position for the stated purpose of officer or animal-control-officer safety. *Sigler Narr*. ("I did not go onto the property, other than the edge by the street, and was there to keep the AC units safe."); *Blackmond Narr*. ("I stayed on the perimeter of the property to make sure AC1 and AC3 were

safe…"); *Modglin Narr*. ("I stayed on the perimeter of the property on the South side of the residence…"); *Taylor Narr*. ("I…stood on the south side of the residence for security reasons.").

By the time these officers arrived, Mr. Rayford was no longer present. Sigler's narrative recounts that Officer Ockomon told him "the subject that was giving him a hard time…went back inside before we arrived," and Officer Ockomon's own narrative states that he "never saw Rayford again" after the initial confrontation. *Defendant's* Exhibit 1, *Sigler Narr*.; *Ockomon Narr*.

Rather than personally inspecting the dogs, Officer Ockomon instructed animal control officers to assess their condition and based his seizure decision on their report back to him: "I then instructed the animal control officers to assess the condition of the dogs. Upon their inspection of the dogs, they advised me that there were 10 dogs on the property and their condition was reported to me as emaciated, old wounds, possibly from fighting, and no food or water. Due to the dog's conditions, I instructed them to seize all ten dogs." *Defendant's* Exhibit 1, *Ockomon Narr*. No warrant was sought or obtained at any point before this seizure. *Id.*

The responding officers' own on-scene observations of the dogs describe the dogs as chained, visibly thin, and bearing visible facial injuries; two of the four officers also described the dogs as aggressive toward both people and one another. *Defendant's* Exhibit 1, *Blackmond Narr*. ("Several of the dogs were aggressive towards people and the other dogs."); *Modglin Narr*. ("Multiple of the dogs were aggressive towards people and the other dogs."); *see also Stokes Narr*. ("k9s are extremely emaciated, and very aggressive toward people and other animals.").

The dogs were loaded one by one into animal control vehicles and patrol cars for transport to the Animal Protection League shelter. *Ockomon Narr*.; *Sigler Narr*. During transport, four of the dogs got loose from interior separators and fought; two were killed. *Defendant's* Exhibit 1,

*Ockomon Narr*.; *Modglin Narr*.; *Taylor Narr*. The remaining dogs were subsequently euthanized by shelter staff. *Id*.; *Ockomon Narr*.; *Stokes Narr*.; *Davis Narr*.

Elizabeth Goodson, identified elsewhere in the record as the owner of the 2030 Dewey Street property, approached Officer Ockomon at the scene and told him "that all of the dogs belong to her." *Defendant's* Exhibit 1, *Ockomon Narr*. Officer Ockomon describes her as "very argumentative," and states that she later called the APD station "wanting to inquire about where her dogs were and how she could get them back." *Id.* By the time Officer Ockomon spoke with her, he informed her only "that her dogs were in bad shape and had already been euthanized." *Id*.

Separately, Blackmond's narrative refers to a "Summary of body cam interview with K. Ockomon," indicating that body camera footage of at least part of the encounter exists within APD's records. *Defendant's* Exhibits 1 & 2, *Blackmond Narr*.

**B. The January 2, 2024 social media warrants**

Just over two months after the October 31 incident, on January 2, 2024, APD Detective Brian Gehrke, as sole affiant, swore five nearly identical search warrant affidavits seeking historical content and location data from Meta Platforms, Inc. as to four (4) targeted accounts attributed to Mr. Rayford: Facebook account No. 100045270723950, identified in the affidavit as bearing the name "Tayda Rayford," *Defendant's* Exhibit 3, *Gehrke Aff*. (Facebook No. 100045270723950); Facebook account "Tayda.Rayford.7," *Defendant's* Exhibit 4, *Gehrke Aff*. (Facebook "Tayda.Rayford.7"); Instagram account "Rayfordtayda," *Defendant's* Exhibit 5, *Gehrke Aff*. (Instagram "Rayfordtayda"); and Instagram account "Taydarayford," *Defendant's* Exhibit 6, *Gehrke Aff*. (Instagram "Taydarayford"). A fifth targeted the Facebook account "Lizzygood87," attributed to Elizabeth Goodson. *Defendant's* Exhibit 7, *Gehrke Aff*. (Facebook "Lizzygood87") at 1. All five affidavits are dated and signed by Detective Gehrke on the same

day. *Gehrke Aff.* (Facebook No. 100045270723950) at 7; *Gehrke Aff.* (Facebook "Tayda.Rayford.7") at 7; *Gehrke Aff.* (Instagram "Rayfordtayda") at 7; *Gehrke Aff.* (Instagram "Taydarayford") at 7; *Gehrke Aff.* (Facebook "Lizzygood87") at 7.

Each affidavit rests on an identical predicate-offense statement, namely, Detective Gehrke swears that he "received information that the offense of Possession of animals for fighting contests (IC: 35-46-3-8) was committed on or about 10/31/2023" by the named target (Mr. Rayford in four of the five affidavits; Ms. Goodson in the fifth) without identifying the source of that information. *Gehrke Aff.* (Facebook No. 100045270723950) at 1; *Gehrke Aff.* (Facebook "Tayda.Rayford.7") at 1; *Gehrke Aff.* (Instagram "Rayfordtayda") at 1; *Gehrke Aff.* (Instagram "Taydarayford") at 1; *Gehrke Aff.* (Facebook "Lizzygood87") at 1.

Each affidavit's "Investigation" section then recites, in materially identical language across all five documents, an abbreviated version of the October 31 incident, to wit: that APD officers "arrived at 2030 Dewey St. in reference to assisting Animal Control Director, Kris Ockomon"; that Officer Ockomon "arrived to investigate complaint of neglect on multiple dogs"; that Rayford "walked inside the house and was not seen again"; and that Goodson "argued with Director Ockomon that she would not allow him to take her dogs." *Gehrke Aff.* (Facebook No. 100045270723950) at 1-2; *Gehrke Aff.* (Facebook "Tayda.Rayford.7") at 1-2; *Gehrke Aff.* (Instagram "Rayfordtayda") at 1-2; *Gehrke Aff.* (Instagram "Taydarayford") at 1-2; *Gehrke Aff.* (Facebook "Lizzygood87") at 1-2. Nowhere in this recitation, in any of the five affidavits, does Detective Gehrke disclose that the October 31 entry began with an anonymous, uncorroborated tip from a caller who "wished to remain unknown" (*see* Section A, *supra*), or that Officer Ockomon's initial encounter with Mr. Rayford's involved a confrontation in which Mr. Rayford made clear

that Officer Ockermon was not welcome onto the property. *Id.* Both omissions bear directly on whether the underlying October 31 entry had a lawful basis.

The same "Investigation" section also states, verbatim and identically across all five affidavits: "None of the dogs were aggressive towards people; however, they were showing signs of aggression towards other dogs." *Gehrke Aff.* (Facebook No. 100045270723950) at 2; *Gehrke Aff.* (Facebook "Tayda.Rayford.7") at 2; *Gehrke Aff.* (Instagram "Rayfordtayda") at 2; *Gehrke Aff.* (Instagram "Taydarayford") at 2; *Gehrke Aff.* (Facebook "Lizzygood87") at 2. This directly conflicts with the contemporaneous, on-scene accounts of two of the four responding officers, given two months earlier, including Officer Blackmond's statement that "[s]everal of the dogs were aggressive towards people and the other dogs," and Officer Modglin's statement that "[m]ultiple of the dogs were aggressive towards people and the other dogs." *See* Section A, *supra* (*Blackmond Narr.*; *Modglin Narr.*).

**C. The June 24-25, 2024 Federal Search Warrant applications and Complaint**

The sequence in which two separate federal search warrants were sworn to in June 2024 is significant because the first affidavit (June 24) would purport to supply probable cause to search the Dewey Street residence, while the second affidavit (June 25) – sworn to only *after* that search had already occurred, and *after* firearms had already been found – would purport to supply probable cause to charge Mr. Rayford with a felon-in-possession charge.

**1. The June 24, 2024 Search Warrant Application (pre-search).**

On June 24, 2024, an FBI Task Force Officer applied by telephone for a warrant to search the Dewey Street residence, in a sealed application filed in Case No. 1:24-mj-00582-MG. *Application for a Warrant by Telephone* ("Fed. SW Appl."), *Defendant's* Exhibit 8, Doc. 1 (S.D. Ind. filed 6/24/24). The application's discussion of Mr. Rayford's alleged dogfighting activity

explicitly incorporates the October 31, 2023 incident: "On October 31, 2023, the Anderson, Indiana Police Department and Anderson Animal Control Services seized ten dogs from a property in Anderson, Indiana that is associated with RAYFORD and GOODSON." Fed. SW Appl. ¶34 (Page 12 of 26, PageID #: 12). The application goes on to state that "[f]ollowing the October 31, 2023 incident where RAYFORD's ten dogs were seized, detectives with the Anderson Police Department obtained a warrant to search the contents of RAYFORD's Facebook account, 'TadaRayford,'" and that this search "revealed the address used to register the Facebook account was the Dewey Street residence." Fed. SW Appl. ¶37 (Page 15 of 26, PageID #: 15). It further recounts Facebook messages allegedly showing Rayford's dog "Gretta" fighting another dog, sent to Ms. Goodson and to a third party, Robert Hamer, in July 2023. Fed. SW Appl. ¶¶38-39 (Pages 15-16 of 26, PageID #: 15-16). Attachment B to this application (the list of items authorized for seizure) authorizes, at item (r), "[a]ny utensils or weapons capable of being utilized in the killing of animals, to include ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges." Fed. SW Appl., Attach. B ¶ r. (Page 24 of 26, PageID #: 24). This application was sworn before the residence was searched, and nothing in this application describes any firearm as having already been found, nor does it contain any photographs of firearms.

**2. The June 25, 2024 search itself**

The Dewey Street residence was searched the following day, June 25, 2024. *Amended Complaint Affidavit* (*"Fed. Compl. Aff."*), *Defendant's* Exhibit 9, *Case No. 1:24-mj-00568-MG, Doc. 7, ¶49* (Page 20 of 22, PageID #: 45) (S.D. Ind. filed 6/25/24). Multiple firearms were found inside the residence, including an Arsenal KP SAMSK, 7.62mm (serial number KPG03035), with a fifty-round drum magazine, and a Springfield Armory SAINT, 5.56 NATO (serial number ST 486375), with a thirty-round magazine. *Id.*

**3. The June 25, 2024 Amended Complaint Affidavit (post-search)**

The June 25, 2024 Amended Complaint Affidavit – which was sworn the day of the search, *after* the firearms had already been located – appends a handful of new paragraphs to the same 48 paragraphs that has been included in the June 24 affidavit. The added Paragraph 49 states that Mr. Rayford "has knowingly sustained prior felony convictions, to include a 2012 felony conviction in Madison County, Indiana for Unlawful Possession of a Firearm by a Previously Convicted Felon," and that he "had access to these firearms." *Fed. Compl. Aff*. ¶49 (Page 20 of 22, PageID #: 45). It then states that "[f]rom a review of Thomas Rayford's 'Tayda Rayford' Facebook page (Facebook.com/tayda.rayford.7)," one of the firearms found in the residence "appears to be similar if not identical" to a firearm depicted in a photograph sent from Rayford's Facebook account via Facebook Messenger in March 2023, and that a fifty-round drum magazine seized from the residence "appears to be similar if not identical" to one shown in a photograph Rayford sent on April 13, 2022, captioned "thts wit the 50 on it." *Fed. Compl. Aff*. ¶49 (Pages 20–21 of 22, PageID #: 45–46). The affidavit goes on to state that an ATF agent was consulted regarding the firearms described. *Fed. Compl. Aff*. ¶50 (Page 21 of 22, PageID #: 46).

The timing sequence is therefore as follows: the June 24 application relied on the October 31 incident to establish probable cause to search the residence – before any firearm had been found, and without reference to any gun photograph, *Fed. SW Appl*. ¶¶34, 37-40; the residence was then searched on June 25 and firearms were found, *Fed. Compl. Aff*. ¶49; and only then, in a second, separately sworn document executed after that search, were the Facebook photographs of a similar firearm and magazine used to corroborate the felon-in-possession charge, *Fed. Compl. Aff*. ¶49. Thus, both (1) the residence search's occasion (an investigation whose Facebook-account

predicate traces to the October 31 incident; *see* Section B, *supra*) and (2) the felon-in-possession evidence trace back to the events of October 31, 2023.

## III. ARGUMENT

### A. The October 31, 2023 warrantless entry and seizure at 2030 Dewey Street violated the Fourth Amendment.

The Fourth Amendment protects not only the home itself, but also its curtilage, which the Supreme Court has concluded is "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). A warrantless entry into a Constitutionally-protected space is "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967). The burden is on the Government to show that its warrantless conduct falls within one of those "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971) (internal citation omitted).

Here, on October 31, 2023, Anderson Police Department Senior Humane Officer Kris Officer Ockomon entered the curtilage of 2030 Dewey Street and ordered the seizure of all ten dogs on the property without a warrant, without consent, and without any documented finding of exigency. The Government may argue an exception to the Fourth Amendment for animal-welfare exigency, but the record developed to date will affirmatively defeat any such claim, as demonstrated below.

#### 1. APD's own documented prior knowledge of the dog-related complaints for the Dewey Street address defeats any claim of exigency.

Exigency is not a categorical rule, but a fact-intensive inquiry into the totality of the circumstances to be decided case-by-case. *Missouri v. McNeely*, 569 U.S. 141, 156-58 (2013). The Seventh Circuit has found that, where officers had probable cause and an opportunity to obtain a

warrant well before they acted, a later claim of exigency "rings hollow," and a reviewing court must "appraise the agents' conduct during the entire period after they had a right to obtain a warrant," not merely at the instant of entry. *United States v. Patino*, 830 F.2d 1413, 1416 (7th Cir. 1987) (citation omitted). Nor may officers "deliberately wait for exigent circumstances to arise and then exploit the exception to justify warrantless entry." *United States v. Dowell*, 724 F.2d 599, 602 (7th Cir. 1984).

Applied here, these authorities are dispositive. By Officer Ockomon's own account, APD had received "several previous calls" about this address, and "action cards" (*i.e.*, APD's own internal documentation) had already been generated and left there before October 31. Officer Ockomon further told the anonymous caller he had separate, pre-existing "previous intel information" connecting Mr. Rayford to dogfighting at the property. Thus, this is not a case of sudden discovery, but one of sustained institutional awareness by the APD of exactly the same animal-welfare conditions that the Government may now attempt to invoke in order to justify skipping the warrant process. Under *Patino* and *Dowell*, both *supra*, that prior knowledge cuts against any after-the-fact exigency here. APD had every opportunity, over multiple prior contacts, both to document conditions at this address and to seek a warrant, but did neither.

**2. *Davis v. State* does not supply the missing exigency, because *Davis* rested on factual predicates absent here, and never reached warrantless seizure.**

In its response, the Government will likely point to *Davis v. State*, 907 N.E.2d 1043 (Ind. Ct. App. 2009), which held that animal-welfare exigency can, in some circumstances, justify warrantless curtilage entry in Indiana under a Fourth Amendment analysis. In *Davis*, neighbors who had not seen the defendant at home over a holiday weekend noticed that his dogs were barking and carrying empty food pans. *Id.* at 1046-47. They also detected a decaying stench emanating from the property, so they called 911. *Id.* The responding deputy, who could smell the odor from

the street before ever entering, went onto the property and discovered a dog carcass and more than a dozen malnourished, chained dogs. *Id.* at 1047. The deputy reported his observations up the chain to a detective, who was later dispatched to independently assess the scene. *Id*. A warrant then issued, before any animal was seized, based on the deputy's observations combined with the neighbors' own accounts. *Id.* at 1047-48. On appeal, the Indiana Court of Appeals held that the deputy's initial warrantless entry was justified by animal-welfare exigency, extending the narrower curtilage-entry logic of *Trimble v. State*, 842 N.E.2d 798 (Ind. 2006) (which had approved an officer's brief entry to check on a single reportedly-starving dog visible from a driveway) to this sort of broader "welfare check." *Id.* at 1049-50. The *Davis* court separately held that a detective's later, independent warrantless re-entry to the same property was *not* justified once the initial exigency had already been addressed, but that this second illegality did not taint the warrant, because the deputy's untainted, already-lawful observations independently supplied probable cause. *Id.* at 1051-52.

Here, the Government may attempt to invoke *Davis* for the broad proposition that animal-welfare concerns can support warrantless curtilage entry. But *Davis* does not support the Government's position here, for at least five (5) independent reasons.

First, *Davis*'s exigency finding rested on reports from identified, known neighbors who had personally observed the animals in distress over multiple days. Officer Ockomon's tip, by contrast, came from an anonymous caller who "wished to remain unknown" and supplied no stated basis of knowledge at all.

Second, *Davis* involved pre-entry corroboration, specifically, a detectable odor of decay noticeable from the street, confirmed by multiple neighbors before any officer set foot onto the property, and also confirmed by the officer before entry. Here, by contrast, nothing corroborated

Officer Ockomon's tip before he acted, as his narrative indicates no hint of seeing or smelling anything relating to animal abuse from the perimeter of the property before he entered.

Third, *Davis*'s facts were freshly and only very recently discovered, because the reporting neighbors were concerned because they had not seen activity at the residence over the course of a single weekend. Here, the opposite is true: Officer Ockomon's own reference to "several previous calls" and prior "action cards" is an admission of a known, long-standing situation.

Fourth, *Davis* never approved a warrantless *seizure* of animals; it approved only warrantless *entry* to observe based on known witnesses and an officer's sensory corroboration, with a warrant obtained before anything was removed from the property. Here, all ten dogs were seized on the spot, with no warrant application at any stage.

Finally as to *Davis*, the court in that case also found that a later warrantless re-entry onto the property by a different police officer who had not personally observed any exigent circumstances was justified, but only because "[p]robable cause may be based on the collective information known to the law enforcement organization as a whole." *Davis*, *supra*, 907 N.E.2d at 1051 (citation omitted). Here, in contrast, every fact relied on to justify the October 31 entry and seizure traces back to the single anonymous tip and to Officer Ockomon's own undisclosed "prior intel." In other words, in *Davis*, there were two separate actors making two separate entries at two separate times, the first of which stood on its own two feet. This case doesn't have the same procedural structure as *Davis*, because there is no second officer who went in independently, on a separate lawful basis, and personally observed something that alone would support what followed.

Accordingly, *Davis* simply cannot serve as authority for the seizure the Government must defend here, nor for any "exigent circumstances" that would justify violation of the Fourth Amendment's warrant requirement.

**3. Any anticipated "staleness" argument is inapplicable, and any "ongoing activity" the Government points to only reinforces the absence of exigency.**

The Government may attempt to counter the foregoing Fourth Amendment analysis by invoking the "staleness doctrine," *i.e.*, the principle that "[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity." *United States v. Mitten*, 592 F.3d 767, 775 (7th Cir. 2010) (quoting *United States v. Pless*, 982 F.2d 1118, 1125-26 (7th Cir. 1992)). However, that doctrine has no application here because it presupposes that the Government sought a warrant at all. *See United States v. Haldorson*, 941 F.3d 284, 292 (7th Cir. 2019) ("It is the rare case where 'staleness' will be relevant to the legality of a warrantless arrest.") "Staleness" governs whether facts recited in a warrant application remain sufficiently fresh to support a finding of probable cause for the warrant to issue. Here, of course, neither Officer Ockomon nor any APD officer sought any warrant to begin with. The "staleness" doctrine simply does not reach a *warrantless* entry and seizure, because no information regarding the "age" of the information was ever requested from any judicial officer.

Moreover, an "ongoing continuous criminal activity" (*Mitten*, *supra*) characterization of the events preceding the October 31 entry cuts against the Government here. Courts do not confine their exigency analysis to the instant of entry, but examine the entire period during which the government had probable cause and an opportunity to seek a warrant. *See* Section III.A.1, *supra*. Here, Officer Ockomon's own account of "several previous calls" and pre-existing "action cards" describes a known, recurring condition that APD officers had repeated opportunities to investigate and address through the ordinary warrant process, but never did.

**B. The anonymous tip underlying the entry was constitutionally insufficient to justify any Fourth Amendment intrusion, let alone a warrantless seizure**

Even if some Fourth Amendment intrusion could be justified on less than full probable cause, the tip here fails even that lower bar. An anonymous tip, without more, does not justify governmental intrusion unless it is corroborated in ways that establish its reliability. *Florida v. J.L.*, 529 U.S. 266, 270-74 (2000); *Alabama v. White*, 496 U.S. 325, 329-32 (1990). Where probable cause is at issue, reviewing courts assess the totality of the circumstances, affording the issuing decisionmaker deference only where a "substantial basis" for the finding exists in the record. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

Here, there was no issuing decisionmaker at all – the tip went straight to a warrantless entry and seizure. Thus, the tip here demands a *more* demanding analysis of its reliability, not less.

**1. The tip bears none of the recognized indicia of reliability.**

The Seventh Circuit evaluates informant reliability along four factors: "(1) the degree to which the informant has acquired knowledge of the events through firsthand observation, (2) the amount of detail provided, (3) the extent to which the police have corroborated the informant's statements, and (4) the interval between the date of the events and the police officer's application for the search warrant." *United States v. Mullins*, 803 F.3d 858, 863 (7th Cir. 2015), *quoting United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014).

Here, every factor cuts against the Government. The caller did not identify herself, gave no basis for her own knowledge beyond a bare observation from an undisclosed vantage point, and nothing she said was corroborated by police before Officer Ockomon acted. There was no controlled interaction, no surveillance, and no independent verification of any kind.

In Seventh Circuit precedent, even a named, sworn informant with claimed firsthand knowledge has been held insufficient to support a residential search where police failed to meaningfully corroborate her account. In *United States v. Peck*, 317 F.3d 754 (7th Cir. 2003), the

confidential informant identified herself, claimed she had personally observed drugs in the defendant's residence two days earlier, and appeared before the issuing judge to swear to the truth of her statements. *Id*. at 756. The Seventh Circuit nonetheless held the affidavit insufficient, because the informant's account lacked meaningful detail, and police corroboration was limited to a routine records check of the defendant, not anything that independently verified any element of what the witness reported. *Id*. at 757. Applying *Peck* here, if a named, sworn eyewitness's account, corroborated by a records check, could not establish probable cause for the Seventh Circuit in *Peck*, then the anonymous tip here fails *a fortiori*: the caller who prompted Officer Ockomon's entry was never identified; never appeared; took no oath; supplied no stated basis of knowledge; and her account was not corroborated by anything Officer Ockomon observed <u>before</u> he entered the curtilage of 2030 Dewey Street and ordered the seizure of the ten dogs.

*Owens v. United States*, 387 F.3d 607 (7th Cir. 2004) reflects the same principle in starker terms. In *Owens*, a residential search warrant rested on a bare-bones affidavit reciting only that an informant had purchased "a quantity" of crack cocaine from the defendant at his residence three months earlier, with no indication of the amount involved or of the informant's reliability. *Id.* at 608. The Seventh Circuit held the affidavit "so inadequate" that not even the good-faith exception could rescue the resulting search. *Id.* Here, the deficiencies are more severe still: unlike *Owens*, where a magistrate at least reviewed and signed off on a warrant before any search occurred, there was no warrant application of any kind before Officer Ockomon acted. A single anonymous call, with no track record of reliability, no explanation of how the caller came to know what she claimed, and nothing corroborating it before entry into the curtilage, is too weak to survive even deferential good-faith review.

*United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002), presents a still closer parallel. There, the government itself conceded that a search warrant affidavit failed to establish probable cause where the affiant characterized the informant only as "believed to be a reliable source" (a conclusory label the court held merited no weight absent supporting facts) and "failed to provide the magistrate judge with information stating what steps, if any, were taken to corroborate" the informant's account. *Id.* at 867. The *Koerth* court further noted that the informant, though available and in custody at the time, was never brought before the issuing judge to testify. *Id.* at 868. Here, the October 31 entry suffers from every one of these same defects, and lacks even what *Koerth* had, *viz*., a named informant who claimed repeated, direct, personal transactions with the defendant over time. In stark contrast, Officer Ockomon's anonymous caller supplied no comparable foundation. *Koerth* also involved a warrant application reviewed by a neutral magistrate before any search occurred, while here the anonymous tip went straight to warrantless entry and seizure, with no judicial check at any point.

The Seventh Circuit's decision in *United States v. Howell*, 958 F.3d 589 (7th Cir. 2020), reaffirms the same reliability "spectrum" described in *United States v. Lopez*, 907 F.3d 472, 479-80 (7th Cir. 2018), namely, that tips from known, trustworthy sources require little independent corroboration, while anonymous tips bearing no indicia of reliability require substantial corroboration before they may support governmental action. *Howell*, *supra*, 958 F.3d at 598. Here, the tip Officer Ockomon received sits at the <u>least</u>-reliable end of that spectrum, to wit: an anonymous caller; no stated basis of knowledge; no corroboration; and no description of any emergency actually in progress at the time of the call. That combination is squarely of the kind that *Howell* and its predecessors treat as insufficient.

*United States v. Glover*, 755 F.3d 811 (7th Cir. 2014), rounds out the inadequacy of the "anonymous tip" here. In *Glover*, a named informant with an established relationship to police provided detailed information, including a physical description of the defendant; the type and location of firearms involved; and facts about the defendant's identity and criminal history that police independently confirmed. *Id.* at 816-17. Yet the Seventh Circuit *still* reversed the denial of a motion to suppress because the affidavit omitted information bearing on the informant's credibility, and because corroboration was limited to "minor facts and legal conduct." *Id*. The *Glover* court emphasized that "[t]he only effort made by police to corroborate [the informant's] statements was a check of [the defendant's] record," which does not itself corroborate a claim that a search will uncover evidence of a crime. *Id.* at 817. In the case at bar, Officer Ockomon undertook no comparable corroboration of any kind before entering the curtilage of 2030 Dewey Street and ordering the seizure of all ten dogs, including no records check, no surveillance, an no independent verification of any sort. Accordingly, if a documented, identified informant's tip, backed by some corroboration, was insufficient in *Glover*, an anonymous caller's wholly <u>un</u>corroborated account cannot support a warrant<u>less</u> entry and on-the-spot seizure, with no judicial involvement whatsoever.

**2. Officer Ockomon's own undisclosed "prior intel" cannot substitute for a documented, corroborated basis.**

The record reflects that it was not the anonymous tip alone, but Officer Ockomon's own reference to unspecified "previous intel information" connecting Mr. Rayford to dogfighting, that contributed to turning a vague, uncorroborated complaint into a decision to act. The source, basis, and reliability of that "intel" appear <u>nowhere</u> in the contemporaneous record. An unexplained, undocumented reference to unspecified prior intelligence is not a substitute for the corroboration that *J.L.*, *White*, and *Howell* (all *supra*) require, and the Government should not be permitted to

backfill the tip's deficiencies with an internal, unverified assertion of "prior intel" that itself was never subjected to any documented reliability determination before the October 31 entry.

### C. The Government's officers intruded upon the Constitutionally-protected curtilage of 2030 Dewey Street, despite the carefully-worded narratives of most of those officers that they remained on the "perimeter" of the property.

The Government may attempt to argue that its agents did not intrude into the curtilage of 2030 Dewey Street, but instead, per their written narratives, remained on the "perimeter." Nevertheless, what those contemporaneous narratives actually establish is that a government agent – Officer Ockomon – indubitably *did* intrude into the curtilage and began his search for evidence and the seizure of property without a warrant. Specifically, most of the responding officers describe positioning themselves at a defined boundary of "the property." Sergeant Sigler describes remaining only "at the edge by the street" specifically because he "did not go onto the property." Officer Blackmond describes staying "on the perimeter of the property." Officer Modglin likewise describes staying "on the perimeter of the property on the South side of the residence," and Officer Taylor describes standing "on the south side of the residence for security reasons." This notably careful language reflects a recognized property line and, taken together, describes a bounded residential property, immediately adjacent to the residence itself, on which the dogs were kept, activity that is intimately connected to domestic life. However, preceding all of those carefully-circumscribed narratives was Officer Ockomon's uncontestable entry into the curtilage. Officer Ockomon's account does not acknowledge any perimeter, but instead describes a direct entry onto the property – without having corroborated any of the information from the anonymous tipster – where he was confronted by Mr. Rayford before he ever reached the dogs. It was from that vantage point, *inside* whatever "perimeter" the four uniformed officers *later* respected, that Officer Ockomon directed other government agents to enter the property and seize the animals.

The curtilage of a home, *i.e.*, the area "immediately surrounding and associated with the home," is treated as part of the home itself for Fourth Amendment purposes, and receives the same protection against warrantless government intrusion. *Florida v. Jardines*, 569 U.S. 1, 6, 11 (2013); *Collins v. Virginia*, 138 S. Ct. 1663, 1670-71 (2018) (curtilage "entitled to the same protection under the Fourth Amendment as the house itself"). Whether an area is curtilage turns on its proximity to the home, whether it lies within an enclosure surrounding the home, the nature of the uses to which it is put, and the steps taken to shield it from observation by passersby. *Jardines*, 569 U.S. at 7 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

Thus, to the extent the Government may contest "curtilage" on this record, that is a factual dispute that the defense is prepared to develop further at a hearing; the officers' own descriptions of a bounded property they felt obliged to stay off of, or at the edge of, are more than sufficient to require the Government – which bears the burden of proof once curtilage is put in issue – to come forward with contrary evidence.

**D. Mr. Rayford has standing to challenge the October 31, 2023 entry**

The Government may also attempt to argue that Mr. Rayford, who did not own the home at 2030 Dewey Street, lacks standing to challenge the Government's warrantless entry thereon. However, Fourth Amendment standing turns on whether the defendant had a <u>reasonable expectation of privacy</u> in the place searched, not on formal property-law labels such as record title. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). One who lawfully occupies or controls a residence, whatever the precise contours of his legal interest, has a legitimate expectation of privacy in it sufficient to claim the Fourth Amendment's protection. *Id.* at 143-44 & n.12; *see also Minnesota v. Carter*, 525 U.S. 83, 89–90 (1998) (distinguishing a mere short-term business visitor, who lacks standing, from one for whom the premises constitute an actual home). Even an overnight guest

with no ownership interest at all has a legitimate expectation of privacy in a home sufficient to claim the Fourth Amendment's protection. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990). Here, it is undisputed that Mr. Rayford resided at 2030 Dewey Street, therefore he has standing to challenge the Government's warrantless entry into, and seizure of property at, his home.

Further, as to the seizure of property here, this standing analysis is properly kept distinct from any separate question about who owned the dogs as chattel. Ms. Goodson's claim of ownership over the animals may bear on whether *she*, rather than Mr. Rayford, could contest the seizure of the dogs specifically as a deprivation of *her* property, but it has no bearing on Mr. Rayford's standing to challenge the more fundamental violation at issue in this motion, namely, the warrantless entry onto the curtilage of the home where he lived. That entry – not the disposition of the animals themselves – is what set in motion the chain of warrants ultimately yielding the Count Nineteen firearms evidence, and Mr. Rayford's privacy interest in the residence where those firearms were later found is squarely his own to assert.

Further still, the record independently establishes Mr. Rayford's expectation of privacy in 2030 Dewey Street without any need to rely on ownership of the dogs. When Officer Ockomon arrived, Mr. Rayford approached his vehicle and, in his own contemporaneous words, told him to "get the f*** off my property." This was a spontaneous, non-litigation-driven assertion of a possessory interest in the premises made at the moment of the encounter itself. Mr. Rayford then retreated toward the residence and went inside, where he remained until after the uniformed officers arrived and the seizure was already underway. Mr. Rayford's conduct reflects exactly the kind of access to, and control over, the interior of the home that affords standing under *Rakas*, *Olson* and *Carter* (all *supra*), regardless of whether he held record title in the home. That Elizabeth Goodson is identified elsewhere in the record as the titled owner of the property, and separately

asserted her own ownership of the dogs, does not diminish Mr. Rayford's independent, personally-asserted possessory interest in the residence and its curtilage. *Rakas* in particular forecloses any argument that title in another person's name defeats a defendant's own reasonable expectation of privacy in premises he treats, and describes in the moment, as his own. Just like the defendant in *Rakas*, Mr. Rayford "had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his 'interest' in those premises might not have been a recognized property interest at common law." *Rakas*, *supra*, 439 U.S. at 143.

**E. The January 2, 2024 social media warrants are fruit of the tainted October 31 entry, as are the firearms seized based on those warrants.**

Once a defendant makes the threshold showing of an unlawful search or seizure, the burden shifts to the Government to show that its evidence is not the tainted fruit of that illegality. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). The question is not merely whether the evidence would not have come to light "but for" the illegal conduct, but whether it was obtained by exploitation of that illegality. *Id.*

Here, Detective Gehrke's five nearly-identical search warrant affidavits, sworn on January 2, 2024, fail this test on their face because they do not merely *reference* the Oct. 31 incident, but make that incident – which, as demonstrated in detail above, was underlain by an unconstitutional intrusion into Mr. Rayford's home – the *centerpiece* of the affidavits. Specifically, each affidavit swears that Detective Gehrke "received information that the offense of Possession of animals for fighting contests (IC: 35-46-3-8) was committed on or about 10/31/2023," without identifying the source of that information. Nearly every other item of specific probable cause in these affidavits likewise ties directly back to that same day, including photographs "with some of the dogs that

were removed from 2030 Dewey St.," and "one of the dogs… involved in the fight while being transported by Animal Control" during the Oct. 31 seizure itself.

Here is the point: Because the October 31 entry and seizure cannot survive Fourth Amendment scrutiny (*see* Argument Sections A, B and C, above), these warrants lose their foundation entirely. That is to say, the predicate offense that these social media affidavits were sworn to investigate is itself the product of the unlawful entry, and the specific facts corroborating that predicate are drawn from the seizure that followed the unlawful entry. Thus, everything obtained through the resulting search of Mr. Rayford's and Ms. Goodson's accounts – including the Facebook video of the dog "Gretta" fighting and the messages sent alongside it – is tainted fruit, not independently-obtained evidence.

*Murray v. United States* confirms that this taint is not confined to the social media warrants themselves, but travels forward through every subsequent step built upon them. The exclusionary rule "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536–37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). A later search does not launder that taint merely because it is authorized by its own, facially valid warrant. Rather, a subsequent warrant-authorized search is a "genuinely independent source" of the evidence it turns up <u>only if</u> the decision to seek that warrant was not "prompted by what [the officers] had seen during the [prior unlawful entry]," <u>*and*</u> <u>only if</u> no "information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542-43.

Here, neither condition was met. The June 24, 2024 federal application to search 2030 Dewey Street relied on the October 31 incident to help establish probable cause [Fed. SW Appl. at ¶¶34-40] before a single firearm had been recovered, and without reference to any firearm photograph. That application was sworn only after, and drew directly upon, the same January 2024 Facebook and Instagram returns whose own foundation – *i.e.*, Detective Gehrke's five affidavits – traces back to the October 31 incident, as demonstrated above. The firearms were not recovered until the following day, during the June 25 search conducted pursuant to that warrant. [Fed. Compl. Aff. ¶49]. Therefore, the predicate offense that was investigated; the informational basis for suspecting that offense; and the electronic evidence corroborating that offense all lead back, link by link, to the same unconstitutional October 31 entry. Under *Murray*, a warrant application built on such a foundation cannot supply an independent source for what it produces; it is simply another step in the same tainted chain. Per this binding precedent, the firearms underlying Count Nineteen are accordingly derivative fruit of the October 31 entry, no less than the Facebook and Instagram evidence that preceded them.

It bears emphasizing, then, that the unconstitutional taint runs directly into the evidence supporting the most serious charge in this case. The June 24, 2024 Search Warrant Application (Case No. 1:24-mj-00582-MG, Doc. 1) incorporates the October 31 incident at paragraphs 34 through 40 to help establish probable cause to search the Dewey Street residence, stating that "[f]ollowing the October 31, 2023 incident where RAYFORD's ten dogs were seized, detectives with the Anderson Police Department obtained a warrant to search the contents of RAYFORD's Facebook account." Fed. SW Appl. ¶37. The application's probable-cause showing therefore rests on the October 31 incident twice over – first, *directly*, through its own incorporation of that day's events, and second, *indirectly*, through its reliance on a Facebook warrant whose predicate offense

was that same incident. Thus, because the October 31 incident was founded on an unlawful warrantless entry and seizure (see Section A, above), both the direct and the indirect pillars supporting the social media warrant fall, and the residence warrant loses the foundation on which the June 25, 2024 search – and the discovery of the firearms underlying Count Nineteen – depended.

Relatedly, the defense anticipates that the Government will invoke the "independent-source doctrine," arguing that the June 2024 surveillance of the residence and the investigation arising from Robert Hamer's independently-seized phone are sufficient, standing alone, to support the residence warrant without regard to October 31. The defense does not concede this point, and reserves full argument on it, including the relevant Seventh Circuit two-part independent-source framework, for reply should the Government raise it. It simply bears noting for now only that the June 24 application itself does not treat the October 31 incident as merely an additional or supplemental basis for a search and seizure, but as *the* basis. That the Government's affiant chose to include it, at length, as part of the probable cause showing, will be difficult – and likely impossible – to reconcile with a later argument that the warrant would have issued just the same without it.

**F. The state drug warrant evidence is likewise downstream of the same taint.**

During execution of the federal residence warrant on June 25, 2024, Detective Gehrke observed suspected marijuana, cash, and a digital scale in a bedroom and adjoining closet, and relied on those observations – together with social-media conversations obtained through the same tainted warrant series addressed in Section E, above – to obtain a separate Indiana state search warrant the same day (Madison Circuit Court, Cause No. 48C02-2406-MC-001922). Detective Gehrke made those observations only because he was lawfully present in the residence under the

authority of the federal warrant addressed in Section E, above, and if that warrant does not survive scrutiny, his presence – and therefore his "plain view" of the drug evidence – rests on the same defective foundation as the firearms discovery, not on any independent basis. The defense raises this evidence for completeness, given its place in the same taint chain, while recognizing that no drug distribution charge currently appears in the operative indictment.

**G. Even if the residence search is otherwise upheld, the warrant's scope did not authorize seizure of the Count Nineteen firearms.**

A search warrant must particularly describe the things to be seized, *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987), and evidence found in plain view during a lawful search is seizable only if its incriminating character is "immediately apparent" in light of what the warrant actually authorizes. *Horton v. California*, 496 U.S. 128, 136–37 (1990). Here, Attachment B to the June 24, 2024 search warrant authorizes seizure, at item (r), of "[a]ny utensils or weapons capable of being utilized in the killing of animals, to include ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges," grouped alongside implements for drowning and burning dogs.

Accordingly, this is not a "general" firearms-seizure clause, but a specific authorization for seizure of "utensils or weapons" connected, by the circumstances of their discovery, to "the killing of animals." The FBI's FD-302 search report, *Defendant's* Exhibit 10, however, shows that none of the four (4) firearms underlying Count Nineteen bore any such connection. Specifically, per that search report, the Springfield Armory SAINT rifle was found under a bed in a bedroom; the Arsenal KP SAMSK rifle was found in a drawer under the same bed; the Taurus G2C pistol was found on the floor of a bathroom closet; and a fifth, uncharged Ruger EC9s was found in a purse near a bedroom dresser – a firearm the Government itself apparently did not consider sufficiently connected to Mr. Rayford to charge. Nowhere does the FD-302's item-by-item log reflect any evidence relating to "the killing of animals," such as blood, animal remains, or any other

circumstance tying any of these firearms to killing an animal. Instead, these weapons were found in the ordinary locations one would expect personal firearms to be kept (under a bed; in a drawer; in a closet), not in any context suggesting a nexus to animal fighting. Reading item (r) to authorize their seizure simply because a gun is generically "capable" of killing an animal would let a narrow, animal-killing-specific clause swallow the "particularity" requirement for the entire warrant. Nearly any firearm is "capable" of killing an animal in the abstract, and a boundless reading of a search warrant's particularity requirement is contrary to settled Fourth Amendment jurisprudence. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, *supra*, 480 U.S. at 84. Here, the Government's agents took the particular description of the things to be seized – *i.e.*, "[a]ny utensils or weapons capable of being utilized in the killing of animals" – and read it as a general license to seize <u>any</u> weapons of <u>any</u> sort, even those with no observable nexus to "the killing of animals," such as those found here in a private bedroom nowhere near where the dogs were being kept. This is just the sort of "general, exploratory rummaging in a person's belongings" that the Fourth Amendment's particularity restriction prohibits. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

Moreover, the circumstances of the search itself undercut any claim that these firearms were an inadvertent plain-view discovery rather than a deliberately anticipated one, to wit: The FD-302's roster of search-team personnel includes an FBI Task Force Officer serving specifically as "IMPD – Gun Liaison," and the firearms were "charged out" to that liaison for separate laboratory examination through IMPD, handled distinctly from the dogfighting evidence that the warrant was ostensibly issued to find. A warrant executed with a dedicated firearms-handling

specialist built into the search team – standing at the ready to process guns through a separate evidentiary track – cannot be reconciled with a warrant whose only authorization for seizing guns was a narrow clause tied to "the killing of animals," of which "guns" were only one in a list of several items ("ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges"), and there were certainly no "ropes specialists" or "wire experts" standing by here alongside the Government's "Gun Liaison." At minimum, this is powerful evidence that the firearms seizure exceeded whatever authorization item (r) actually provided, independent of – and in addition to – the taint arguments in Sections A through E, *supra*.

### H. Detective Gehrke's January 2024 affidavits contain material omissions warranting a Franks hearing.

Finally, a defendant is entitled to a hearing on the veracity of a search warrant affidavit upon a substantial preliminary showing that the affiant included a false statement, or omitted a material fact, knowingly and intentionally or with reckless disregard for the truth, and that the false statement or omission was necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The materiality inquiry asks whether the affidavit's remaining, accurate content – with the falsehood corrected or the omission restored – still supports probable cause; doubtful cases are resolved in favor of the warrant. *Davis v. State*, 907 N.E.2d 1043, 1052–53 (Ind. Ct. App. 2009).

*Davis*'s own facts (*see* discussion at Section A.2., above) illustrate how demanding that standard is. In that case, minor overstatements were immaterial because the core probable cause showing survived their removal. Here, Detective Gehrke's January 2, 2024 affidavits – written roughly two months after October 31 by a detective who was not present that day – diverge from the contemporaneous, on-scene APD narratives in at least two (2) substantive and significant respects that go to the heart of the entry's legality.

First, and most significantly, every one of the five affidavits describes Officer Ockomon's visit only as arriving "to investigate complaint of neglect on multiple dogs," omitting entirely that the underlying tip came from an anonymous caller who "wished to remain unknown" and supplied no stated basis of knowledge, *i.e.*, the reliability deficiencies addressed in Section B, *supra*. A magistrate reviewing an unadorned – in Detective Gehrke's words – "complaint of neglect" would have no occasion to question the reliability of the underlying report. However, a magistrate who had been told the truth that the entire investigation traced to an anonymous, uncorroborated tip would have reason to scrutinize it. This material omission by Detective Gehrke bears directly on whether Officer Ockomon had any lawful basis to be on the property in the first place, which is exactly the kind of omission *Franks* and *Davis* treat as material. Under *Franks*, the materiality inquiry asks whether the affidavit's remaining, accurate content still supports probable cause. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). *Davis* illustrates how substantial the remaining, accurate content must be, because in *Davis*, after correcting the inaccuracies in the affidavit, an independent, untainted evidentiary core remained sufficient to support probable cause in the form of a dog carcass; breeding equipment; and a second detective's own on-scene observations. *Davis*, *supra*, 907 N.E.2d at 1053-54. Here, by contrast, restoring the omitted facts leaves no comparable independent anchor, because every specific fact in Gehrke's affidavits traces back to the single anonymous, uncorroborated tip and Officer Ockomon's own undisclosed "prior intel." Unlike in *Davis*, there is no untainted remainder capable of independently sustaining probable cause once the omission is corrected.

Second, none of the five affidavits mentions Mr. Rayford's confrontation with Officer Ockomon at all, *i.e.*, the exchange in which Mr. Rayford told Officer Ockomon to "get the f*** off my property." This omission removes from the magistrate's view the entire context in which

Officer Ockomon's "investigation" actually unfolded, namely, a confrontational encounter in which the property's occupant asserted a possessory interest and ordered the officer to leave, not a cooperative welfare check. Like the first omission, this one goes directly to the circumstances surrounding the entry itself.

Taken together, the record makes a substantial preliminary showing sufficient to warrant a *Franks* hearing on the January 2024 affidavits, independent of the fruit-of-the-poisonous-tree arguments addressed above. Here, restoring the omitted facts does not merely add color to the affidavits; it replaces a routine-sounding "welfare check" with an uncorroborated anonymous tip and a hostile confrontation, materially undermining the probable cause showing that those affidavits were sworn to establish.

**CONCLUSION**

For the foregoing reasons, Defendant Thomas Rayford respectfully requests that this honorable Court SUPPRESS all evidence obtained directly or derivatively from the October 31, 2023 warrantless entry and seizure at 2030 Dewey Street, including but not limited to the evidence obtained through the January 2, 2024 social media warrants; the June 24-25, 2024 federal residence search warrant and Amended Complaint affidavit; and the June 25, 2024 state drug warrant. Defendant further requests that this Court suppress the firearms evidence underlying Count Nineteen on the independent ground that its seizure exceeded the scope of the warrant that purportedly authorized it. Finally, Defendant respectfully requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the veracity of Detective Gehrke's January 2, 2024 search warrant affidavits, and any further relief this Court deems just and proper.

Respectfully submitted,

/s/ Khalid A. Kahloon
Khalid A. Kahloon
600 W. Main Street, Suite 500
Louisville, KY 40202
502-261-7200
Email: kahloon@msn.com
*Attorney for Defendant Thomas Rayford*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 30th day of July, 2026, the foregoing Motion and Memorandum of Law was filed electronically with the Clerk of the Court by using CM/ECF System, which will send notice of filing to all counsel of record.

/s/ Khalid A. Kahloon
Khalid A. Kahloon